Mr. Grosz-Yosinski? Yes, Your Honor. And proceed. Thank you. Thank you, Your Honor. May it please the court. Your Honor, the district court's claim construction ruling in this case consistently used a dictionary first approach that focused on the extrinsic evidence at rather than the... Mr. Grosz-Yosinski? Mr. Grosz-Yosinski, this is Judge Schen. Just a couple of quick housekeeping questions. First of all, is it true that if this court affirms the district court's construction of either emulsion or oxygen dissolving substance, then we affirm the final judgment? That is correct, Your Honor. Okay. And I just also wanted to confirm the patent here, the 225 patent. Did it expire already? Yes, Your Honor. Okay. Are there any other litigations involved with the 225? There are not, Your Honor. Okay. Thank you. Please go ahead with your argument. Thank you, Your Honor. So the district court's claim construction ruling focused on the extrinsic rather than the intrinsic evidence. And this is perhaps most evident and notable with respect to its construction of the term emulsion. And so with respect to that term, Your Honors, the district court adopted a claim construction for that term that is directly contradicted by the plain language of the claims, and it did so by focusing on dictionaries rather than on the intrinsic evidence. The same is true with respect to the term oxygen dissolving substance. The district court ignored clear and unequivocal disclaimer, and instead decided to focus on testimony from Vexcom's experts, extrinsic evidence. Now, Your Honors, with respect to the first term, I just spoke about emulsion. Can I, this is just Toronto. Can I, can I just ask you to actually take these in the reverse order? On oxygen dissolving, the oxygen dissolving term, as I understand it, well, first of all, do you dispute here that the solubility of oxygen in the bodily fluids, the non-circulatory system, non-blood bodily fluids, are essentially water? I'm sorry, Your Honor. I want to make sure I understand your question before I answer it. Would you mind just saying it one more time? It cut off for a second there. Sure. So, so this term, the district court said that your proposal that the oxy-, that the solubility need only be greater than graphite and a few other things, which are extremely low, is wrong, and also said that the right benchmark for the solubility term is water, and as part of that relied on the notion that the bodily fluids where this device will, that this device will dissolve bodily fluids, and that those bodily fluids are essentially water-like in solubility of oxygen. It's that last factual premise that I'm asking you, initially, do you dispute that factual premise about the solubility of oxygen in those bodily fluids being awfully close to the solubility of oxygen in water? I think generally, Your Honor, we agree, and that's accurate. I think, though, that the district court's construction still suffers from the flaws that we spoke to in the briefing. Okay. And so, as Your Honor requested, focusing on the term oxygen-dissolving substance first, from our perspective, Your Honor, there's two issues with this.  One is to acknowledge the prosecution history or statements made during it, including the disclaiming statements by Dr. Clark, and the second one is construing it only in terms of solubility and ignoring permeability. And so, you used the term benchmark, Your Honor, and I agree with you. That's what this dispute was about. What is the benchmark and how are we going to define it? Mr. Grosz-Ryczynski, this is Judge Chen again. Do you happen to know which substance has a higher oxygen solubility? Is it water or is it things like graphite and polyethylene that were itemized during the prosecution history? It is water, Your Honor. Okay. And so, I guess you want the term oxygen-dissolving substance to capture a wider range of substances because polyethylene and graphite and things like that have a lower, decidedly lower, oxygen solubility than something like water or bottled water for that matter. Okay. All right. Thanks. All right. Yes, Your Honor. And so, our position is that this disclaiming statement that was made to distinguish the Wilkins reference in accordance with this court's precedent in Omega and its subsequent rulings has to be part of the claim construction. This fight was over what is the benchmark that this oxygen-dissolving substance is going to be compared to. During prosecution, in distinguishing Wilkins, Dr. He says that graphite, nylon, polyethylene, or polystyrene are not oxygen-dissolving substances, and he says it's because they don't have high enough oxygen solubility. There is nowhere in the intrinsic evidence, and Dexcom hasn't pointed to anything, where the benchmark is set as water. Dr. Clark, who is renowned widely as the father of the biosensor, could have obviously set the benchmark using water. He could have distinguished Wilkins on that basis, and it would have been a much simpler, more straightforward path, because Judge Chen, as you just pointed out, water has a higher solubility. It would have been even easier to distinguish Wilkins. But he didn't. He made a conscious decision to limit it to the four substances that are identified in our proposal. Can I just say, this is Judge Toronto, can I ask you, I'm troubled, I guess, about how much is being made of the prosecution history. Suppose you had a patent in which the claim uses some term, and the spec says the amount of that has to be greater than seven, and then during prosecution, the examiner points to Prior Art Smith, and the applicant says, oh, no, no, no. We're higher than that. That would not redefine or disclaim or set a new benchmark of one if the other evidence made clear it had to be at least seven. And that's what I think. So why is water not the seven and one the graphite here? And then the question is, why doesn't water remain the benchmark? Your Honor, because there's nothing in the intrinsic evidence that says the amount, using your example, has to be greater than seven, that's just absent. And this is a fiction that was created by Dexcom's expert, the extrinsic expert testimony, and it was bought into by the district court. And so what our... What about the passages in this written description, for example, one is that column 10 around line 30, describing water as an example of a poor oxygen carrier, and then the other passage at column 13, where at the very top of column 13, it says an advantage is that steroids like perfluorocarbons are much better at dissolving oxygen than is water. And so the inference to take away from all of this is that the patent drafter is criticizing water in terms of its capacity to be a good oxygen carrier as something that oxygen can dissolve in. And the entire purpose of the patent is to have emulsified with the enzyme, some kind of substance, any kind of substance that is a very, very, very good oxygen carrier, something with a very high oxygen solubility. And when you add that all up, we should take away from the written description that the patent has essentially disclaimed the idea that water should be thought of as an oxygen dissolving substance. Your Honor, in response to that, I say as follows. I think it is completely improper to impart disclaimer based on two limited, extremely limited excerpts that do not clearly and unequivocally compare the oxygen dissolving substance's solubility to water. That's not, I agree with you, Your Honor, that in those two limited excerpts, there is a discussion about water. However, my understanding of this court's claim construction jurisprudence is that it is improper based on two limited statements about a preferred embodiment to then equate those to disclaimer and impart limitations in the claim. In contrast, in the prosecution history, you have a clear and unequivocal statement as to what actually qualifies as an oxygen dissolving substance and it's being defined in relation to four different substances, not water. And so to me, Your Honor, this is a question of the proper framework for claim construction and the weight that should be afforded to limited excerpts about a preferred embodiment in a specification versus a clear statement made during prosecution history to secure the patent in suit. Counsel, your rebuttal time. Yes, Your Honor, I will reserve the remainder of time for rebuttal unless there are any additional questions at this time. We hear from the other side, please. Thank you, Your Honor, this is Rick Malloy, may I proceed? Yes, Mr. Malloy, please. Thank you. And may it please the court, Rick Malloy, on behalf of DEXCOM, the judgment in favor of DEXCOM should be affirmed. Each of the two terms identified in the judgment, oxygen dissolving substance and emulsion, provide an independent basis for a finding of no infringement here. And our metrics must prevail on both terms to obtain a remand. The district court's constructions of both of these terms, as well as the other. Can you start, can you start with the start with the oxygen dissolving substance one? What, why is, why does water set the benchmark for the solubility? Yes, Your Honor, the 225 patent states that the claimed oxygen dissolving substance is one where oxygen is extremely soluble. And having a substance where oxygen is extremely soluble is critical to the glucose oxygen imbalance problem that's described in the patent. That problem is that in bodily fluids where these sensors are placed, there is a very low ratio of oxygen to glucose. The patent indicates that at the surface of the electrode, it's approximately, it can be as high as 100 to 1. Right, so there's a lot of wasted, wasted glucose, so it's not counted. Right. So that's right. Essentially, Your Honor, the oxygen is rate limiting. And in order to ensure that you're achieving an accurate glucose measurement, you need to provide enough oxygen to ensure that that reaction is accurately measuring the amount of glucose instead of just the very low amount of oxygen. Now, the specification and the prosecution history both states that the issue being addressed is that poor solubility of oxygen in biological fluids, which the court, I believe, has a record at Appendix 2407, and the solution is providing an emulsion with that oxygen dissolving substance where oxygen is extremely soluble or preferentially soluble in order to provide more oxygen. And both the specification at columns 13, line 2 through 4, and the file history at Appendix 3482 do use water as a comparison. And the patent and the file history also refer to bodily fluids, but they use water to describe the benefits of that oxygen dissolving substance. Now, our metrics position here that the oxygen dissolving substance can be graphite or certain polymers that are barely, if at all, oxygen soluble or have very low oxygen solubility would undermine the fundamental purpose of the invention, which is to use that to address the glucose-oxygen imbalance. If the oxygen dissolving substance can have an even lower oxygen solubility than water or biological fluids where oxygen is already poorly soluble, then one would be better off just leaving water or bodily fluids in the emulsion rather than replacing it with substances that have an even lower oxygen solubility. And that's why the 225 patent consistently compares the properties of the oxygen dissolving substance to that of water or other biological fluids. Adding a substance with a lower oxygen solubility would actually defeat the purpose of the invention by exacerbating the glucose-oxygen problem. Can I just ask you to talk about the emulsion issue, although your opposite number didn't get much of a chance to talk about that. The challenge for you is claim five. Explain how you properly get around that challenge. Yes, Your Honor. So claim five refers to solids and steroids, but doesn't support deviating from the customary meaning of emulsion for at least two reasons. First, the specification indicates that the reference to solids in claim five is referring to solids that are first dissolved in solution. In other words, things that are liquids before they're emulsified. And the specification provides some examples of that. For example, at column five, lines 25 through 29, it explains that the enzyme, which is typically a solid as well, in the emulsion is dissolved into an aqueous solution before being emulsified. Is there any example in the written description of the oxygen dissolving substance being initially a solid that then dissolves into the liquid-liquid emulsion? There is, Your Honor. At column 12, lines 63 through 67, the patent describes what the patent refers to as an oxygen dissolving substance, steroids, which are also referred to there in claim five, being used in the emulsion concentrations in solution at about 0.1 to 1.0 percent by weight, and indicates that the steroids gradually dissolve in the aqueous phase of the enzyme mixture. So the specification actually refers to both components of the emulsion. What about the passage towards the bottom of column eight, particularly the section 186, that says, quote, essentially, tiny solid or liquid particles of material that readily dissolve oxygen are held in intimate contact with an oxygen utilizing enzyme, which is preferably in an insoluble form. And then it goes on in the next paragraph. The action of this emulsified oxygen carrier is twofold. And I take away from that the idea that the oxygen carrier is being described as having been emulsified with the enzyme. And as such, it is in the form of tiny solid or liquid particles in intimate contact with that enzyme. So it feels like I know this is it might conflict with the ordinary understanding of the word emulsion, but here the patent seems to be contemplating that we have an emulsion of tiny solid particles of the oxygen carrying substance with the liquid enzyme. Am I misreading these sentences here? Your Honor, you're not misreading it in the sense that you're correct that the oxygen dissolving substance has certainly been emulsified at that point. But what that portion of the specification around line 59 also indicates is that it's now been insolubilized as well. And that's consistent with the claim language that refers to adding the cross linker to then form the insolubilized gel, which is different than the emulsion. And that's the same thing that's being referred to in that paragraph, which you can see by the language talking about the enzyme, which has been preferably in an insoluble form. So at that point, the cross linker has been added and the emulsion has been essentially insolubilized into a gel. Well, when we go back to claim one, it talks about a sensor comprising two elements, a conductive electrode and a stabilized enzyme emulsion. And then that emulsion comprises three components, the enzyme, the oxygen dissolving substance, and the protein cross-linking agent, which forms a stabilized gel. So to me, just reading the claim on its face, it seems to be equating the claimed emulsion with the stabilized gel and the stabilized gel is made and emulsion. Interchangeably, those words are made of three things, enzyme, oxygen, oxygen dissolving substance, and cross-linking agent. So that seems to be entirely consistent with what's being described here at the bottom of column eight, which supports the idea that of column five's reference to an oxygen dissolving substance can be made of tiny solid particles. And whether that's at the beginning of as a starting material or in the final finished product. Your Honor, it is consistent with what we were seeing in column eight, but the key language in claim one is the term forming. So the emulsion isn't insolubilized or stabilized until the cross-linker is a stabilized gel, which consists of and comprised of the cross-linked protein and then particles of the oxygen. Are you saying I'm misreading the claim when I read the claim as requiring the cross-linking agent to be part of the emulsion? I think the cross-linking agent is part of the emulsion, Your Honor, when it's added to the emulsion. However, when the cross-linker is added. According to this claim, there is no emulsion until you add the cross-linking agent. Well, that's true, Your Honor. And then once you add the cross-linking agent, there's that temporal limitation in there that it provides for forming the insoluble, the stabilized gel. So in other words, the emulsion consists of those and is comprised of those three substances, the liquids. And then once the cross-linker is added, it becomes something different, the stabilized gel. And everybody in this case, the experts acknowledge that a gel is different than an emulsion, but they still understand that those things are different. Outside the context of this patent, I agree. Well, Your Honor, this patent also does describe emulsions as being two liquids throughout. Each and every example of the emulsion that's set forth in the patent includes the aqueous enzyme and then some other liquid formed. And then we get to the tiny solid particles at the bottom of Column A. Yes, and that's true after the enzyme emulsion is insolubilized and the gel is formed. In short, Your Honor, our view is that consistent with Thorner and other authorities, the references in the specification there are not inconsistent with the plain and ordinary meaning of the term emulsion. Is it your understanding that the reference to steroids at the bottom of Column 12 that you initially were referring us to, that steroid is being used as an oxygen dissolver there? Because that's not the way I understood it. Are you saying it is? Yes, so the steroid, Your Honor, that they're describing there is actually used as an anti-inflammatory, which can be added, but steroids are... So it's not the oxygen dissolving substance, is that right? No, steroids, Your Honor, are described throughout the patent. No, I'm talking about it in that I'm talking about the discussion you cited us to at the bottom of Column 12. When it talks about a steroid there, is it talking about a steroid in the context of serving as the oxygen dissolving substance? You just give me a yes or no answer, please. Your Honor, it's talking about the steroid as an anti-inflammatory. So the answer, no? Well, I don't think it's I don't think it's not an oxygen dissolving substance. But in the context of this particular paragraph, if this particular part of the written description, when the patent is talking about a steroid, is it talking about it as an oxygen dissolving substance? Well, Your Honor, at Column 13, if you look to the end of the paragraph, it says that an advantage is that steroids like perfluorocarbons are much better at dissolving oxygen than is water. So I think the patent's acknowledging that even though it's describing steroids there in the context of adding this additional anti-inflammatory agent, that the steroid is acting as an oxygen dissolving substance. And in addition to the specification, Your Honor, the prosecution history here does reflect the plain meaning of the term emulsion. During prosecution, the applicant used the term droplets to describe the emulsion and its components and to distinguish the prior art where glucose oxidase was bonded to a solid component, which is another strong indicator that the customary meaning of emulsion, a liquid dispersed within a liquid, is used here in the claims. If the court has any additional questions for me on either oxygen dissolving substance or emulsion, I'm more than happy to answer them, or I'm also happy to address any of the other terms if the court has questions. There don't appear to be any more. Brethren, do you have any? No, nothing for me. Thank you. Thank you, Your Honor, for your time. I just ask that the court affirm the claim constructions and affirm the judgment in favor of Dexcom. Okay. We have, uh, any response? Yes, Your Honor. Tim Grotjesinski. Thank you. Um, Your Honor, there's a lot of turning to the first term oxygen dissolving substance. A lot of the statements about critical to the invention or the purpose are, are parroting, um, Dexcom's expert rather than once again, focusing on the intrinsic evidence, but setting that aside for a minute, the discussion that we've all been having about, um, the, the, the, uh, I'm sorry, the ability to oxygen dissolving substance, um, and whether or not it should be compared to water or not. None of that accounts for permeability. Okay. And so even if there are similarities that does not address the permeability. And so one of the other issues that we have with that construction, Your Honor, by the district court is that it explicitly found, and this is a quote from the 22, the district court found that permeability has no place in the construction of this term. And that is at lines seven to eight from that page at lines 22 to 23, same page, same term, the district court in support of its holding relies on excerpts from the intrinsic evidence that explicitly are discussing permeability, not solubility. And so why should we be not limiting this to water or using that as the benchmark? Well, because that does not take into account your honor, the permeability of the oxygen developing substance, which the intrinsic evidence, including the district court's own claim construction ruling tells us is something that is used to define the term. Now, Your Honor, in Omega, this court set forth the framework for disclaiming statements. You start with the ordinary meaning of the term. The ordinary meaning of the term is a substance that dissolves oxygen. And what you do then is you narrow the scope of the term consistent with the disclaimer. That's the statement made that is about Wilkins and that is in our metrics is proposal. Now, a bit ago, I believe there was discussion about whether or not these couple of limited excerpts from the patent specification can constitute implicit disclaimer or something to that effect. I just want to point out to the court, DECCOM has never argued that any of the statements from the patent specification rise to the level of lexicography or disclaimer. That has never been an argument and the district court did not find that. And yet that's essentially what they're asking this court to do. They're asking this court to elevate two limited excerpts from a patent specification and utilize those to find some implicit disclaimer, despite the fact that the patentee explicitly states otherwise during the file history. And respectfully, Your Honor, that's improper and is contrary to this court's claim construction precedent. That's all I had, unless the court has additional questions about the other terms at issue. I know that I don't have much time left. Any other questions? Nope. Nope. Okay. This matter will stand submitted. Uh, thank you, counsel. Thank you, Your Honor. Thank you, Your Honor. The honorable court is adjourned until tomorrow morning at 10 AM.